# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

Nos. 04-3408 & 04-3415

JAMES HESS & JOHN HESS,

*Plaintiffs-Appellants,*

*v.*

REG-ELLEN MACHINE TOOL CORP.
and REG ELLEN MACHINE TOOL CORP.
EMPLOYEE STOCK OWNERSHIP PLAN,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 00 C 50275 & 02 C 50007—**Philip G. Reinhard**, *Judge.*

———————

ARGUED MAY 6, 2005—DECIDED SEPTEMBER 6, 2005

———————

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Reg-Ellen Machine Tool Corporation ("Reg-Ellen") administers an Employee Stock Ownership Plan ("ESOP") for its employees that is governed by the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Plan participants John and James Hess, brothers and former employees of Reg-Ellen, each brought suit in federal district court against Reg-Ellen and the Reg-Ellen ESOP, claiming that the plan administrator had wrongfully denied their requests to move

their retirement funds from Reg-Ellen stock into diversified investments. *See* 29 U.S.C. § 1132(a)(1)(B) (authorizing suits by participants in plans covered by ERISA to enforce rights under terms of plan). John Hess also sued to enforce his alleged right under the Illinois Business Corporation Act to inspect Reg-Ellen's books and records. *See* 805 ILCS 5/7.75 (requiring corporations to allow shareholders to examine corporate books and records for a proper purpose)*.* On the parties' cross motions for summary judgment, the district court granted summary judgment to the defendants, and the Hesses appeal. For the reasons stated below, we affirm.

## I.

John Hess began working at Reg-Ellen in 1987, and James Hess followed suit two years later in 1989. Both resigned in 1996, when they were either 51 or 52 years old (we assume from the fact that the Hesses have the same birth date that they are twins). At the time they resigned, the Hesses had pension benefits in Reg-Ellen's ESOP. ESOP's are "a type of pension plan intended to encourage employers to make their employees stockholders." *Steinman v. Hicks*, 352 F.3d 1101, 1102 (7th Cir. 2003); *see also* 29 U.S.C. § 1107(d)(6); *Summers v. State St. Bank and Trust Co.*, 104 F.3d 105, 106 (7th Cir. 1997). As we explained in *Steinman*, in the typical ESOP, the employer contributes the stock to the retirement plan on behalf of its employees. *Steinman*, 352 F.3d at 1102. In Reg-Ellen's case, however, before 1994 employees were also allowed to contribute on their own behalf by withholding money from their pay-check—in plan terms, "salary reduction contributions."

In addition to Reg-Ellen stock, the ESOP allowed partici-pants to channel salary reduction contributions into what the plan calls the "Other Investments Account," comprised of more diversified investments. Before 1994, Reg-Ellen also

made contributions on behalf of plan participants to either the Reg-Ellen stock fund or the other investments account. The plan explains that plan participants had the right to "direct the Trustee to invest [their] contributions" or contributions made by Reg-Ellen on their behalf "in either (i) an Employer Stock Fund or (ii) the Other Investments Account." Reg-Ellen ESOP § 4.12(a). The plan further specifies that the trustee will invest assets in the stock fund primarily in Reg-Ellen stock and assets in the "Other Investments Account" in diversified securities and property (not including Reg-Ellen stock). Reg-Ellen ESOP § 4.12(b),(c).

In 1995, Reg-Ellen's Board of Directors amended the ESOP to eliminate employees' salary reduction contributions and the lion's share of Reg-Ellen's contributions to the ESOP. Previously Reg-Ellen had matched the total amount of all salary reduction contributions via what the plan calls the "Employer's Elective Contribution" and had also contributed a discretionary matching amount for certain eligible employees. Reg-Ellen ESOP § 4.1(a),(b). These contributions, together with participants' salary reduction contributions, were eliminated as of December 1, 1994, the retroactive effective date of the amendments. Reg-Ellen ESOP Amended § 4.1(a),(b). Thus, the only money going into the ESOP after December 1994 was in the form of a "discretionary amount" contributed by Reg-Ellen. Reg-Ellen ESOP § 4.1(c).

The board amended the Plan in this way in preparation for an upcoming change in ownership at Reg-Ellen. Specifically, in 1997 David Lewellen, who had been the president of Reg-Ellen and principal shareholder since 1978, sold his majority ownership interest to the ESOP. This sale coincided with Lewellen's retirement. Thus, in January 1998, Timothy Turner succeeded Lewellen as president of Reg-Ellen, and Lewellen's former assistant, Lorraine Morris, became secretary of Reg-Ellen.

Around this same time, John and James (who had left in 1996) began inquiring about their options under the pension plan. They wrote identical letters to Turner and Plan Trustee Richard Bennett, requesting a distribution of their "ESOP money to roll over into an IRA account of [their] choice." Craig Thomas, the attorney for the Reg-Ellen ESOP, replied to the Hesses' letters. He informed them that they would not be eligible for a distribution until they were 55 years old and enclosed a copy of the plan for their reference. The Hesses continued requesting a distribution over the next several months, but Reg-Ellen steadfastly maintained that they were not yet qualified.

In June 1998, John again wrote Bennett (the ESOP trustee), this time requesting to diversify his Reg-Ellen stock from the stock fund to the Other Investments Account. At some point James Hess made a similar request. In support of their request, the Hesses relied on amendment 4.12(i), which had been added to the plan with the 1995 amendments eliminating employees' salary reduction contributions. Although Bennett thought the amendment supported the Hesses' attempts to diversify their Reg-Ellen stock, Turner and Thomas (the plan's attorney) disagreed. Both maintained that the Hesses must first satisfy the diversification requirements located elsewhere in the plan, which included attaining 55 years of age.

The Hesses thus requested a hearing on their claim to diversify their contributions to Reg-Ellen stock. Although they had been represented by counsel while corresponding with Reg-Ellen, a different attorney represented them at the appeal hearing before Reg-Ellen's administrative committee. The committee was comprised of plan administrator and company president Turner, Morris, and four other corporate officers of Reg-Ellen. On September 30, 1999, the committee held a hearing on the Hesses' claim, which was framed as follows: "Whether [John and James are] entitled to diversify [their] pre-December, 1994 contri-

butions into the Plan which are currently invested in Reg-Ellen Machine Tool Corp. stock." Although not relevant here, James Hess also appealed his claim to a distribution on account of an alleged disability. With the exception of a medical report relating to the disability claim, the Hesses presented no evidence at their hearing other than the plan document itself.

Just over a month later, the administrative committee denied the Hesses' claims, reasoning that they were not entitled to diversify their stock because they were not yet 55 years old. *See* Reg-Ellen ESOP § 4.12(g) (enumerating diversification requirements). Although the Hesses did not refer to it, the committee also considered section 4.12(i), the amendment that the Hesses' previous counsel had relied on to support their diversification claim. The committee concluded, however, that the amendment was intended to allow those participants who had contributed salary reduction contributions into the Other Investments Account to direct the investment of their pre-amendment contributions within that account. Thus, reasoned the committee, section 4.12(i) did not advance the Hesses' claim to diversify their Reg-Ellen stock.

John and James then each filed suit against Reg-Ellen and the Reg-Ellen ESOP (together "Reg-Ellen") under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which allows a participant in a plan governed by ERISA to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Each alleged that a decrease in the value of Reg-Ellen stock between 1997 and 2001 had caused him to lose money. In particular, the complaints alleged that John saw the value of his 48,564 shares decrease by more than $111,000, and James saw the value of his 9,702 shares drop by more than $50,000 (parenthetically, we note that we find these allegations puzzling, since James owned

approximately 1/5 as many shares as John, yet is alleged to have lost nearly half as much money). John's complaint also included a state-law claim under the Illinois Business Corporation Act alleging that Reg-Ellen wrongfully denied him the opportunity to inspect its corporate books and records. *See* 805 ILCS 5/7.75. The district court consolidated the Hesses' suits for decision, and both the Hesses and Reg-Ellen moved for summary judgment. The district court granted Reg-Ellen's motion, concluding that the committee's denial of the Hesses' request to diversify was not arbitrary or capricious and that John's state-law claim failed because he was not a "shareholder" as that term is defined in the Illinois Business Corporation Act.

## II.

### A.

We review a district court's decision on cross-motions for summary judgment de novo. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). "With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Tegtmeier*, 390 F.3d at 1045 (citation and internal quotations omitted). In ERISA cases the scope of the district court's and likewise our review is governed by the rule that a denial of benefits is reviewed de novo unless the plan gives the plan administrator discretion to construe policy terms. *See Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005). Here the parties agree that Reg-Ellen's plan gives the plan administrator discretion to interpret the plan, Reg-Ellen ESOP § 2.6 ("The Administrator . . . shall

have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan."). Thus we review the administrator's decision under the deferential arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Ruttenberg*, 413 F.3d at 658. Under this "least demanding form of judicial review," *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999), we will not set aside a denial of benefits based on any reasonable interpretation of the plan, *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir. 1998). Indeed, whether or not we would have reached the same conclusion is irrelevant; we will overturn the fiduciary's denial of benefits only if it is "completely unreasonable." *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005) (citation and internal quotations omitted); *see also Tegtmeier*, 390 F.3d at 1045; *Mers*, 144 F.3d at 1021.

Although acknowledging the grant of discretionary authority in Reg-Ellen's ESOP, the Hesses suggest our review should be more searching because the committee that approved the denial of their claims was biased. Specifically, they claim that the Reg-Ellen officers and directors who administer the ESOP have an inherent conflict of interest because any decision to award benefits will adversely affect Reg-Ellen's bottom line. Although the Supreme Court in *Firestone* recognized that a fiduciary's conflict of interest should weigh as a "factor" in our analysis of the fiduciary's decision, *id.* 489 U.S. at 115, we have repeatedly rejected arguments for a heightened standard of review solely because a corporation or insurer interprets its own plan to deny benefits. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981 (7th Cir. 1999); *Chojnacki v. Georgia-Pac. Corp.*, 108 F.3d 810, 815 (7th Cir. 1997); *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). In *Chalmers* we pointed out that

ERISA endorses the "notion of a corporate officer who doubles as a plan administrator," 61 F.3d at 1344, and would establish procedures for limiting or prohibiting the practice if it were a cause for concern, *id.*; *see also Chojnacki*, 108 F.3d at 815 (accord). Moreover, we have recognized that companies have an incentive not to deny meritorious claims because such behavior would negatively impact their reputation and leave employees unsatisfied with their fringe benefits. *See Mers*, 144 F.3d at 1021; *Chalmers*, 61 F.3d at 1344.

The Hesses, however, suggest that the bias against their claims is more significant here because Reg-Ellen lacked sufficient assets to grant their requests for diversification. Because Reg-Ellen is not a publicly traded company, it must buy participants' shares of stock from the ESOP in order to pay out claims from the stock fund. According to the Hesses, both Turner and Morris admitted that Reg-Ellen would have been unable to buy back the shares to pay the Hesses' claims. The deposition testimony the Hesses rely on, however, does not go that far. When asked if Reg-Ellen had "in excess of $250,000 cash" available to buy the Hesses' stock, Turner said that it did. He conceded however, that paying out that amount would "change the whole forecasting going forward" as far as what the ESOP could do with the other plan participants. And Morris testified that she did not remember how much Reg-Ellen had available in liquid assets in 1998 when the Hesses made their claims and that she was unsure how awarding their claims would affect company assets.

Given these acknowledgments, the Hesses' claim of bias has more teeth to it than similar claims that we have rejected in the past. This is because in those cases in which we have rejected plaintiffs' claims of bias, we have done so in part because a decision to award benefits in those cases would have had a minor impact on the companies' financial well-being. *See Perlman*, 195 F.3d at 981 ("When the

administrator is a large corporation, the firm has a financial interest, but the award in any one case will have only a trivial effect on its operating results."); *Mers*, 144 F.3d at 1020-21 (noting that defendant had "consistently been named as one of the fifty largest companies in the 'Fortune 500' listing" and that the "impact of granting or denying benefits . . . [was] minuscule compared to [defendant's] bottom line"); *Chalmers*, 61 F.3d at 1344 ("[The defendant] is a corporation which generates revenues of nearly $6 billion annually and is therefore not likely to flinch at paying out $240,000.").

However, contrary to the Hesses' suggestion, the possibility that the committee was operating under a conflict of interest does not change the arbitrary and capricious standard of review. Citing two cases from the Eleventh Circuit, the Hesses maintain that the possibility of bias shifts the burden to the fiduciary to prove that self-interest played no part in his decision. *See Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001); *Adams v. Thiokol Corp.*, 231 F.3d 837, 842 (11th Cir. 2001). To the contrary, we have consistently held that the "presence of a conflict of interest does not change the standard of review." *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960 (7th Cir. 2001) (citing *Firestone*, 489 U.S. at 115); *see also Perlman*, 195 F.3d at 981; *Chojnacki*, 108 F.3d 810. Moreover, unlike the Eleventh Circuit, we have concluded that the existence of a *potential* conflict is not enough. *Mer*s, 144 F.3d at 1020. Instead, we require the plan participant to offer "specific evidence of actual bias that there is a significant conflict." *Id.* 144 F.3d at 1020. We question whether the Hesses' assertion that Reg-Ellen "may not have had the funds available" satisfies this standard. And our reluctance to disturb the presumption that the fiduciary is acting neutrally, *id.*, is not helped by the Hesses' failure to provide us with any concrete figures to support their theory.

That said, Turner's admission that granting the Hesses' claims would impact Reg-Ellen's operating results gives us pause. Given the evidence that the committee's decision to deny the Hesses' claims may have been animated by concerns for Reg-Ellen's finances, we may perform a slightly "more penetrating" review. *Manny v. Central States, Southeast & Southwest Areas Pension & Health and Welfare Funds*, 388 F.3d 241, 242-43 (7th Cir. 2004) (quoting *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052-53 (7th Cir. 1998) for proposition that arbitrary and capricious standard in ERISA cases is a "sliding scale" that moves in relationship to the degree of suspicion of partiality). Thus, we bear in mind the possibility that the committee had an interest in denying the Hesses' claim, but the pertinent question remains whether its decision was arbitrary and capricious.

## B.

Ultimately we cannot conclude that the committee's decision to deny the Hesses' claim for diversification was arbitrary and capricious. The committee relied on the following plan provision, which controls diversification of assets in Reg-Ellen stock:

> Within the period of 90 days following the end of each Plan year, any Participant in the Plan who has attained age 55 and completed at least ten years of participation in the Plan shall be permitted to direct the Trustee to diversify up to 25 percent (reduced by amounts previously diversified) of his accrued benefit in the Employer Stock Fund by investing such amount in investments other than Employer stock[.]

Reg-Ellen ESOP § 4.12(g).

By its terms, that section allows diversification only for those plan participants who are 55 years or older, which the

Hesses admittedly were not at the time of the hearing. Under this provision, there is thus nothing unreasonable about the committee's decision to deny the Hesses' requests to diversify their Reg-Ellen stock.

The Hesses, however, claim that amendment 4.12(i) authorizes diversification. To put their position in perspective, we quote the amendment in its entirety:

> Notwithstanding any provision of section 4.12 to the contrary, that on or after December 1, 1994, there shall be no Employer's Elective Contribution or matching contributions on or behalf of Participants. Although Participants shall continue to have the right to direct the investment of the Participant's Account as to contributions made on or before November 30, 1994, Participants shall have no rights pursuant to section 4.12 to direct the investment of the Participant's Account made on or after December 1, 1994.

Reg-Ellen ESOP Amendment § 4.12(i).

This language leaves much to be desired in terms of clarity. It is, however, clear that plan participants "continue" to have some right. The nature of that continued right provides the primary bone of contention between the Hesses and Reg-Ellen.

The Hesses claim that the latter half of section 4.12(i) is intended to assure participants the continued right to direct their pre-December 1994 investments between Reg-Ellen stock and the Other Investments Account. The problem with this interpretation is that, once invested in Reg-Ellen stock, the plan did not generally allow participants to move contributions that had been invested in Reg-Ellen stock to the Other Investments Account. Prior to the 1995 amendments, contributions made by participants or Reg-Ellen to either fund were controlled by section 4.12. That section provides that participants may decide whether contributions go into Reg-Ellen stock or the other account. Reg-Ellen

ESOP § 4.12(a). Their decision, however, may only be made *prospectively*. *Id.* § 4.12(d),(e). Thus, the right to move contributions already in Reg-Ellen stock would be a new right, not a continued right. Before the 1995 amendment participants were allowed to elect each year whether their *future* contributions (in increments of 25%) would be made to either the Reg-Ellen stock fund or the Other Investments Account. *Id.* § 4.12(a),(d), (e). Because there was no right before 1995 to direct funds previously invested in Reg-Ellen stock into the Other Investments Account, we are unconvinced by the Hesses' interpretation of section 4.12(i).

The committee's interpretation, however, is also unsatisfying. In its decision the committee asserted that the amendment (presumably 4.12(i), although it is not explicitly cited) was added for those plan participants who had contributed their salary reduction contributions to the Other Investments Account. The committee interpreted the amendment as maintaining the rights of participants who had contributed to that account "to direct the investment of amounts in these other investments." On this understanding, the committee characterized section 4.12(i) "not [as] a change to the Plan, but rather a clarification that Participant's [sic] maintained this right." According to Reg-Ellen, the right the committee is referring to is the right to move funds *within* the Other Investments Account, which it says contains three diversified funds. This interpretation is problematic because section 4.12(i) by its terms is not limited to the Other Investments Account—it refers simply to the "Participant's Account," which presumably would include those assets in Reg-Ellen stock. And like the Hesses, Reg-Ellen is unable to point to any plan provision explicitly granting participants the right to move their contributions within the Other Investments Account before December 1994, making it questionable whether such a right could be "continued" on the authority of section 4.12(i). In short, section 4.12(i) is ambiguous, which leaves us hard-

pressed to conclude that the committee's interpretation, which is a reasonable way to resolve the ambiguity, was arbitrary or capricious. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) ("When as in this case the plan document does not furnish the answer to the question, the answer given by the plan administrator, when the plan vests him with discretion to interpret it, will ordinarily bind the court. That is implicit in the idea of deferential review of the plan administrator's interpretation.").

The Hesses, however, suggest that the ambiguity should work in their favor. Specifically, they argue that because the amendment is ambiguous, it must be "constructed against the drafter and in favor of the plaintiffs." But the cases they cite to support this proposition (the "contra proferentem" rule) are cases applying general contract law or reviewing interpretations of ERISA plans de novo, and are thus inapplicable here. When a plan gives the administrator discretion to interpret it, as does Reg-Ellen's ESOP, "we cannot merely apply federal common law principles of contract interpretation, but rather must view the contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 833 (7th Cir. 2004); *see also Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1101 (7th Cir. 1998) (same). The requirement that we give deference to the plan administrator's interpretation is especially applicable when plan language is ambiguous, for that is precisely when the administrator exercises his grant of discretion. *See Manny*, 388 F.3d at 244 (ambiguous plan language created "interpretive task confided" to plan's trustees).

We also reject the Hesses' argument that the ambiguity should prompt us to look beyond the plan itself to interpret the amendment. In the district court the Hesses submitted an affidavit from Lewellen in which he interprets section 4.12(i) to mean that after the 1995 amendments, partici-

pants could direct the trustee to move pre-December 1994 contributions from the stock fund to the Other Investments Account. Lewellen points out that since the 1995 amendments eliminated employee contributions and Reg-Ellen matching contributions, section 4.12(i) makes no sense unless participants "continue" to have the right to invest their previous contributions in *either* Reg-Ellen stock or the Other Investments Account. The Hesses claim that Lewellen was the plan administrator at the time of the amendment; indeed, they assert that Lewellen *wrote* the amendment. Who better, the argument goes, to explain the meaning of the amendment?

There are two problems with their argument. First, they did not present Lewellen's interpretation at the hearing before the current plan administrator, and we have consistently held that our review is limited to the record before the administrative committee. *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004); *Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). Indeed, the Hesses did not advance any argument based on section 4.12(i) to the committee. The committee addressed section 4.12 only because the Hesses had raised the amendment in their previous correspondences requesting diversification.

Secondly, we have explicitly rejected the premise that a former plan administrator retains authority to construe plan language, even language he may have drafted. In *White v. Sundstrand Corp.*, 256 F.3d 580, 584 (7th Cir. 2001), a group of plaintiffs seeking benefits under Sundstrand's floor-offset pension plan argued that the interpretation of one of the plan's drafters should prevail over the plan administrator's interpretation. In rejecting their argument, we pointed out that the plan gave discretion to interpret its language to the plan administrator, not the drafter. *Id.* Similarly, section 2.6 of Reg-Ellen's ESOP

gives the plan administrator discretion to interpret it, not Lewellen. As we analogized in *White*, "A Secretary of Labor who drafts and promulgates a rule will have leeway to interpret its language only as long as she remains in office; when a new Secretary is confirmed, interpretive discretion comes with the job. The ex-Secretary may write op-ed pieces trying to influence the rule's application, but the elbow room that goes with delegated authority belongs to the incumbent, not to the author." *Id.* at 584-85. Just so with Lewellen. Although he may have had authority to interpret section 4.12(i) when he administered the ESOP, that authority passed to Turner when Lewellen retired. That the new administrator interprets section 4.12(i) differently than Lewellen does not render his decision arbitrary and capricious. *Id.* (Pointing out that new plan administrators may change interpretation of plan because the discretion to interpret plan "goes with the office"). Thus, the fact that Lewellen may now[1] interpret the amendment in a way that supports the Hesses' claim does not render the committee's contrary interpretation arbitrary and capricious.

## C.

The Hesses advance several other attacks on the committee's decision, but none render it unreasonable. First, they make much of a "payout" to another former Reg-Ellen employee, William Ray. While Lewellen was still president of Reg-Ellen, he authorized a distribution of Ray's benefits

---

[1] We note that both Turner and Morris testified by deposition that Lewellen's interpretation represented an about-face from his alleged earlier insistence that contributions to Reg-Ellen stock stayed in Reg-Ellen stock. Reg-Ellen suggests that this change of opinion is linked to Lewellen's status as an adverse party to Reg-Ellen in two separate lawsuits, but we see no reason to delve into the motivation for Lewellen's interpretation.

to him after he was terminated in 1994. At that time, Ray (who was 28 years old) had Reg-Ellen stock valued at $42,293, which was subsequently paid out to him in two installments. The Hesses maintain that the inconsistent treatment of Ray renders the committee's interpretation of their claim arbitrary and capricious.

Although we have recognized evidence of inconsistent interpretations as a factor to be considered in determining whether a plan administrator's decision is arbitrary and capricious, *Chojnacki*, 108 F.3d at 816, the payout to Ray does not render the committee's denial of the Hesses' claim suspect. First of all, Ray received a payout, an entirely different benefit than the diversification John and James seek. Additionally, the plan treats participants like Ray who have less than $50,000 in the plan differently. Section 7.4 provides that if the vested portion of a terminated employee's account is less than $50,000, the participant may elect to "cause the entire Vested portion of the Terminated Participant's Account to be paid to such Terminated Participant[2]." Reg-Ellen ESOP § 7.4(a). For these reasons, the Hesses' comparison to Ray is inapt. *See Gallo*, 102 F.3d at 922 ("The 'inconsistency' on which the plaintiffs harp . . . is superficial."). Additionally, the decision to pay out Ray's claim happened under Lewellen's tenure, and thus does little to prove that the current plan administrator has applied the plan inconsistently. *See White*, 256 F.3d at 585 (pointing out that interpretation of ERISA plan may change with new plan administrator); *see also Chojnacki*, 108 F.3d

---

[2] Because we think Ray's treatment has little bearing on Reg-Ellen's decision regarding the Hesses' claims, we do not explore whether Ray's payout was proper. It may be that the lump payments he received contravened certain plan provisions governing distributions—indeed, Turner claimed in her deposition that as she interprets the plan, Ray's payout was "different than the way the Plan calls."

at 816 (ERISA plan administrator's allegedly inconsistent interpretation in two cases insufficient to render decision to deny plaintiffs' claims arbitrary or capricious).

The Hesses also claim that it was improper for the committee to rely on section 4.12(g) of the plan instead of section 7.4, which they claim applies to terminated employees. But section 7.4, entitled "Determination of Benefits Upon Termination," deals with distribution, not diversification. It provides that "[d]istribution of the funds due to a Terminated Participant shall be made on the occurrence of an event which would result in the distribution had the Terminated Participant remained in the employ of the employer." Reg-Ellen ESOP § 7.4(a). Because the plan appears to make the requirements for distribution the same for both current and terminated employees, we see nothing wrong with the committee's failure to explicitly mention section 7.4. in its decision. Section 4.12(g) speaks directly to the requirements for diversification, which is what the Hesses claimed they wanted to do. Thus, we find nothing arbitrary or capricious about the committee's reliance on section 4.12(g) to reject the Hesses' claims.

## D.

Alternatively, the Hesses claim that they are entitled to relief under an estoppel theory. They base their claim on certain statements Lewellen allegedly made in a November 1995 meeting to explain the 1995 amendments to Reg-Ellen employees. At that time, Lewellen told the participants that section 4.12(i) secured their right to direct pre-December 1994 investments into either company stock or the Other Investments Account. Lewellen further assured employees that they could change their election once per plan year to provide for switching between the two funds in multiples of 25%. The Hesses claim that Lewellen was the plan administrator at that time and that they relied on his interpreta-

tion of section 4.12(i) to their detriment—specifically, they claim that if they had known that Turner would refuse their request to diversify, they would have requested a rollover or a distribution under other plan provisions. [3]

The district court rejected the estoppel claim because the Hesses had failed to present it to the administrative committee. Additionally, the district court noted that it was doubtful whether an oral promise could form the basis of an estoppel claim under ERISA and pointed out that any reliance on Lewellen's promises would not be "reasonable" since the meaning of section 4.12(i) was disputed.

In their opening brief, the Hesses take issue with the court's observations about whether an oral promise can support an estoppel claim and whether their reliance on Lewellen's assurances was reasonable. They ignore, however, the district court's primary ground for rejecting the estoppel claim—their failure to make it to the appeal committee. This omission dooms their estoppel claim. *See Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 823 (7th Cir. 2001) (appellant's failure to challenge independent, alternate ground offered by district court results in waiver of challenge to alternate ground and affirmance on that basis).

In their reply brief the Hesses argue for the first time that an estoppel claim "may not" be the sort of claim that must be raised administratively because it is part of the federal common law that courts are to develop for interpret-

---

[3] In their opening brief, the Hesses offer an alternative basis for their estoppel argument: a February 1998 letter from the plan attorney telling them they were not entitled to a distribution. Although they claim they relied on this allegedly false representation to their detriment, we do not explore the issue because the Hesses raise this argument for the first time on appeal. *See Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 586 (7th Cir. 1999).

ing ERISA claims. *See Firestone*, 489 U.S. at 110-11 (articulating requirement that courts develop a body of federal common law of rights and obligations under ERISA-regulated plans); *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999) (recognizing estoppel as a "matter of federal common law in at least some ERISA cases"). The argument is an interesting one, and has some support in our case law. *See Vallone*, 375 F.3d at 629-30 (allowing discovery beyond the administrative record on plaintiff's estoppel claim because "the estoppel claim is not a review of a decision of the Plan Administrator"). Interesting as it may be, we do not reach this contention, because its appearance for the first time in the Hesses' reply brief means that it is waived. *See, e.g.*, *Coker*, 165 F.3d at 586; *cf. JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780-81 (7th Cir. 1999) ([W]hen a litigant wants a court to buy a novel theory it has to do more than assert it, wholly ignoring the objections that have been made to it and the cases that have questioned or rejected it.").

The Hesses also argue in their reply brief that Reg-Ellen cannot rely on their failure to raise the estoppel claim at the administrative level because it did not assert that defense below. Having reviewed Reg-Ellen's brief in opposition to the Hesses' motion for summary judgment, we disagree. There, Reg-Ellen asserted that since the Hesses had "presented no claim for promissory estoppel at the . . . appeal hearing," the district court should not consider the claim. This language leaves us at a loss to understand the Hesses' position that Reg-Ellen waived the argument, especially in light of the fact that the district court recognized this defense and relied on it as a ground to reject the estoppel claim. In sum, we reject the Hesses' estoppel claim because they did not defend their failure to raise it before the administrative committee until their reply brief, and that is too late. *See Jones v. Union Pac. R.R.*, 302 F.3d 735, 741 (7th Cir. 2002) (failure to address one of district court's

holdings amounts to waiver of any claim of error with respect to that issue and waiver cannot be cured by argument in reply brief).

### III.

That leaves John Hess's claim that he was entitled to inspect Reg-Ellen's books and records under the Illinois Business Corporation Act. *See* 805 ILCS 5/7.75 (requiring corporations to allow shareholders to examine corporate books and records for a proper purpose). A claim under the Business Corporation Act has two components: the requester must be a "shareholder" and have a "proper purpose" for her request. The district court concluded that John was not a "shareholder," which the act defines as a "holder of record shares." *See* 805 ILCS 5/1.80(g).

On appeal, John takes issue with that conclusion, pointing out that he received notices of annual shareholder meetings and also received a letter from Reg-Ellen that begins "Dear Shareholder" and goes on to explain the requirements for exercising one's right to inspect Reg-Ellen's books and records. John also received a stock certificate for his Reg-Ellen shares, although the certificate was later turned over to the ESOP trustee "for safekeeping." At the summary judgment stage, we think this evidence sufficient to allow a factfinder to conclude that John was a shareholder, notwithstanding Reg-Ellen's claim that the ESOP trustee is the holder of record.

However, John must also have a "proper purpose" for his request. *See* 805 ILCS 5/7.75(b) (shareholder of record has right to examine books and records, "but only for a proper purpose"). His brief offers us no clues as to the purpose behind his request to examine Reg-Ellen's records. This omission is fatal to his claim because he bears the burden of demonstrating that his request was made for a "proper purpose." *See West Shore Assocs., Ltd. v. Am. Wilbert Vault*

*Corp.*, 645 N.E.2d 494, 498-99 (Ill. App. 1994). Moreover, a "mere statement alleging a facially proper purpose is not enough." *Id.* John has made no attempt to demonstrate that his request was made for a "proper purpose," which under Illinois law means acting in good faith, having an honest motive, and seeking to protect the interests of the corporation as well as the shareholder. *See Corwin v. Abbott Labs.*, 819 N.E.2d 1249, 1251 (Ill. App. 2004); *Taghert v. Wesley*, 799 N.E.2d 377, 381 (Ill. App. 2003). We thus affirm the district court's denial of his claim under the Illinois Business Corporation Act, although on a different ground. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1032 (7th Cir. 2003) (court of appeals may affirm district court's grant of summary judgment on any ground supported by record).

## IV.

For the foregoing reasons, we AFFIRM the district court's judgment granting summary judgment to Reg-Ellen and the Reg-Ellen ESOP.

A true Copy:

      Teste:

                      _____

                      *Clerk of the United States Court of Appeals for the Seventh Circuit*