**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 25, 2005
Decided March 22, 2006

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 05-1507

| | |
|---|---|
| SANDRA K. SIMS,<br>      *Plaintiff-Appellant,* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division |
|    *v.* | No. 1:04-CV-536-LJM |
| JO ANNE B. BARNHART,<br>      *Defendant-Appellee.* | Larry J. McKinney<br>*Chief Judge.* |

**O R D E R**

Sandra Sims applied for social security disability benefits alleging that she suffers from anxiety, osteoarthritis, and a somatoform disorder that causes vision problems. Her claim was denied initially, upon reconsideration, and after a hearing before an Administrative Law Judge ("ALJ"), who determined that she is not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner of Social Security. *See Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Sims sought review in the district court, which upheld the Commissioner's decision. We have resolved in a separate opinion Sims's allegation that she has a disabling somatoform disorder, *see Sims v. Barnhart,* No. 05-1507, slip op. (7th Cir. Mar. 22, 2006), and in this order we discuss her remaining arguments on appeal.

Sims has been found disabled in the past.  In 1992 an ALJ concluded that Sims suffered from a somatoform disorder and granted her supplemental security income ("SSI").  Those payments ceased due to excess resources when Sims inherited a farm, *see* 20 C.F.R. § 416.1324(a), though the record does not specify when that inheritance occurred or when precisely her benefits stopped.  Sims apparently exhausted her excess resources because she reapplied for SSI in 1997.  She also applied for disabled Widow's Insurance Benefits in 1998 after her husband passed away.  Her new applications describe a variety of ailments, but at her hearing before the ALJ she narrowed the list to arthritis and, when the ALJ later explored her mental condition, added that she has an anxiety disorder.  Sims was 54 years old at the time of her hearing in 2000 and had not worked since 1980.

Sims testified at the hearing that she has arthritis in her feet, hands, lower back, and knees.  She said that she sometimes fell because of the arthritis in her knees and feet.  Along with pain in her hands, she also experienced swelling that prevented her from wearing rings, doing crafts which she had done before, making a fist, or picking up small coins.  She testified that her toes sometimes curled under her feet and that she had varicose veins in her legs that caused pain and swelling.  But Sims estimated that she could lift about ten pounds four to six times per hour all day and that she could walk a block, but no more.

As for her daily activities, Sims testified that she did not have a driver's license and had stopped driving because of her ocular and arthritis problems.  She said that she did not go out to church or movies, but was able to feed and dress herself and do household chores for short periods of time.  Sims's daughter did her laundry and went shopping with her.

The ALJ on his own initiative explored whether she suffered from a psychological condition.  Sims offered little testimony about her mental condition even though she said that she had experienced depression, especially after her husband died.  She also stated that she had trouble with her memory and sometimes with her concentration.  And she said that she did not handle stress well and often found it difficult to breathe when she felt stressed.

The remaining evidence is drawn from medical records.  A psychologist, Dr. David Pfenninger, examined Sims at the request of the Social Security Administration ("SSA") in June 1999 and reported that she had cried after her husband died in 1998, but had adjusted well since.  Sims told Dr. Pfenninger that to help her sleep she had for several years taken Lorazepam, a benzodiazepine used to treat anxiety disorders, *see* THE PDR FAMILY GUIDE TO PRESCRIPTION DRUGS  66 (9th ed. 2002).  She denied exhibiting anxiety symptoms and behavior. Dr. Pfenninger found Sims to be cooperative, articulate and conversational, and able to display a full range of affect and normal attention and concentration.

Though Dr. Pfenninger reported that Sims had a slightly anxious interpersonal style and was mildly shy, he ultimately concluded that she had no mental impairment. An expert for the SSA later reviewed the record evidence and agreed that Sims had no medically determinable mental impairment. At the 2000 hearing, another nontreating, nonexamining psychologist, Dr. David Jarmon, testified that he had reviewed the entire record and listened to Sims's testimony and concluded that she had no medically determinable mental impairment.

Although Sims never testified that she suffered from anxiety at the hearing and raised that as a possible disabling condition for the first time to the Appeals Council, her medical records do document prescriptions for Lorazepam given to her over an eleven-year period by her treating physician, Dr. Gary Midla. She also tendered what the parties call "a form submitted to [Dr. Midla] by Ms. Sims's attorney" on which Dr. Midla wrote "anxiety" and on a corresponding line, "poor." Two other doctors continued to prescribe Lorazepam after that period. Dr. Larry Hughes prescribed the drug for Sims in 1989 after noting that her "anxiety is relatively stable." And Dr. Gregory French continued the prescription after Sims saw him in 1991 and told him that she had been prescribed Lorazepam in the past. And, finally, the record includes a report from Dr. Ellen Traicoff, who performed a psychological evaluation in 1992 at the request of the SSA and diagnosed Sims as having a "Generalized Anxiety Disorder and Associated Mild Depression."

As for Sims's arthritis, Dr. Midla had ordered x-rays of her hands, knees, back and toes in 2000 when she consulted him after applying for benefits. The radiologist reported that the x-rays showed subtle narrowing of the joints in her hands, tiny calcifications in the tissues of the index and thumb fingers, and degenerative arthritic changes in the first joint of the right hand that was fairly extensive, but that they were otherwise unremarkable. The x-rays of her knees showed no joint effusion, and mild to moderate joint narrowing of the joint space with some marked narrowing of the joint space on the left knee. There was minor curvature of her spine, but otherwise the spinal x-rays were unremarkable. Her toes were "held in flexion" (curved underneath her), and there was some narrowing of the joints in her toes suggesting degenerative arthritic changes. Metatarsus deformities were mild on the left and mild to moderate on the right. After receiving the x-rays, Dr. Midla diagnosed Sims with osteoarthritis. He did not characterize the severity of her symptoms, although he did propose work restrictions after noting that she had difficulty using her hands, feet, and toes. He also observed that she had contractures (loss of joint motion due to a fixed tightening of the muscle, tendons, ligaments or skin), but he did not identify the affected joints. The Commissioner discounts this diagnosis as one produced on "a form submitted to [Dr. Midla] by Ms. Sims's attorney," and apart from responding to counsel's questionnaire, Dr. Midla provided no interpretation of the results of the x-rays.

Agency physicians also reported on Sims's arthritis. Dr. Thabet Al-Sheikh performed a consultative examination in 1998 and noted in his written report that she complained about arthritis in her knees and hands. He also noted that Sims had full but painful motion of her dorsal lumbar spine and crepitus (crackling sounds) in her left knee. Otherwise, he found that she had a normal gait and ability to walk on her heels and toes, and no edema, atrophy, or spasms. Dr. Mazen Alsatie performed another consultative examination of Sims in 1999 and documented a reduced range of motion of her spine and extremities. Dr. Alsatie noted severe arthritis in Sims's knees and back, but no edema, normal gait and station except for difficulty walking on her heels and toes due to back pain, and no atrophy or spasm.

Finally, a vocational expert testified about the job opportunities available to a person with Sims's ailments. A state-agency physician, Dr. L. Bastnagel, had earlier reviewed the record evidence to determine Sims's residual functional capacity ("RFC"). He concluded that Sims could perform light work that accommodated an individual with limited near and far acuity. A second agency physician also reviewed the record and agreed with Dr. Bastnagel's assessment of Sims's RFC. The vocational expert took into account Sims's particular characteristics and an RFC for light work and concluded that she could find work as a cashier, mail clerk, or general office clerk.

In his 2001 decision, the ALJ recounted the medical evidence and followed the familiar five-step analysis for determining whether an applicant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 416.920(a)(4). Applying that framework, the ALJ found at Step One that Sims had not engaged in substantial gainful activity since her alleged onset date. At Step Two the ALJ determined that Sims's osteoarthritis was severe, but that she had neither a medically determinable mental impairment, nor a "severe" ocular disorder. He moved on to Step Three to consider whether Sims's arthritis medically equaled the impairments listed in the Listing of Impairments. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 (2000). He compared Sims's medical evidence of arthritis to Listings 1.03, 1.04, and 1.05C and ultimately concluded that she met none of those listings. At Step Four, the ALJ relied on the opinions of the agency reviewers and concluded that Sims had an RFC for light work. Finally, the ALJ determined at Step Five that Sims was not disabled because the vocational expert testified that there were jobs in the economy that a person with her characteristics could perform.

The ALJ's decision in 2001 makes no reference to reports of two diagnoses in 1991 and 1992 that Sims had "chronic anxiety" and a "generalized anxiety disorder." The ALJ gives little weight to Dr. Midla's prognosis for anxiety because he questioned the strength of the physician's relationship with Sims. Nor did the ALJ find any objective evidence to support Dr. Midla's proposed work limitations for

Sims's arthritis. The ALJ explained that Sims did not see him regularly, "just for colds and follow-ups."

As relevant here, Sims principally argues that the ALJ's decision is not supported by substantial evidence because, in her view, the ALJ (1) failed to recognize that she suffers from a generalized anxiety disorder; and (2) cited but misinterpreted x-ray evidence of arthritis in her hands, knees, toes, and spine. As to the purported anxiety disorder, the ALJ accepted the views of three psychologists who agreed that Sims did not suffer from an anxiety disorder. Dr. Midla, a general practitioner, did prescribe Lorazepam and give Sims a "poor" prognosis for anxiety, but even he did not explicitly diagnose her with a general anxiety disorder. The ALJ rejected Dr. Midla's prognosis in favor of the opinions of the three doctors who specialized in psychology, as he was entitled to do. *See* 20 C.F.R. § 404.1527(d)(2) (treating physician's opinion entitled to controlling weight only if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Finally, the ALJ noted that Sims characterized the Lorazepam prescription as one for sleep assistance. This evidence, taken together, provides substantial support for the ALJ's determination that Sims did not establish that she suffered from anxiety in the period relevant to her application.

Although Sims faults the ALJ for focusing only on that relevant period and not discussing the diagnoses of anxiety in 1991 and 1992, the ALJ was not tasked with deciding whether Sims had an anxiety disorder before she filed her first renewed application in 1997. The ALJ relied on the opinions of doctors who examined her specifically for an anxiety disorder after she reapplied for benefits and found none. *See Groves v. Apfel*, 148 F.3d 809, 810-11 (7th Cir. 1998) (recognizing that evidence presented at earlier hearing, when evaluated *in combination with later evidence*, may help establish disability). In any event, to qualify for a disability under the listing for anxiety disorders, Sims needed medical documentation of persistent fears, panic attacks, or obsessions that have interferenced with her daily life. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.06. None the evidence she submitted showed that she met this requirement. So even if the ALJ should have explained why he disregarded diagnoses that Sims had an anxiety disorder eight years before the hearing, Sims has never established how the evidence showed that she met Listing 12.06.

Sims's other argument is that substantial evidence does not support the ALJ's determination that the osteoarthritis in her hands, knees, spine, and toes did not rise to the level required by the listings. Sims asserts that the ALJ misunderstood the x-ray evidence, but rather than identify what was misunderstood, she simply restates the radiologist's findings without explaining how they meet the listings. Here, the ALJ actually relied on Dr. Midla's diagnosis

when he found at Step Two that Sims has severe osteoarthritis.  But at Step Three when the ALJ compared the x-ray reports to the type of evidence required by the listings, he found that Sims's conditions did not measure up to those in the listings.

First, the ALJ did not consider arthritis in Sims's hands presumably because Listing 1.04 requires arthritis in a "major joint," though that term is undefined.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1.  Sims suggests no other listing under which she might qualify for the arthritis in her hands.

As for her knees, Listing 1.03 requires marked limitation of motion or abnormal motion of the joint and significant joint space narrowing that markedly limits walking or standing ability.  20 C.F.R. pt. 404, subpt. P, app. 1.  The x-rays showed no joint effusion, and mild to moderate joint narrowing of the joint spaces with some marked narrowing of the left knee joint.  The radiologist's findings that characterize the joint space narrowing as "mild and moderate" as opposed to "significant," as well as Sims's own testimony and that of other physicians that she was not limited in walking and standing, provide substantial support for the ALJ's conclusion that she did not meet Listing 1.03.  But even though she did not meet the listing, the ALJ took into account her evidence regarding arthritis in determining that she could perform only light work.

For disorders of the spine, Listing 1.05C required the ALJ to find a vertebrogenic disorder with pain, muscle spasm, significant limitation of motion in the spine, and appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.  20 C.F.R. pt. 404, subpt. P, app. 1.  Listing 1.00B also required the ALJ to look at other neurological factors like the applicant's gait, any limitation of movement of the spine given quantitatively in degrees from the vertical position, motor and sensory abnormalities, muscle spasm, and deep tendon reflexes.  *Id*.  The ALJ found that Sims did not have any limitation of the spine, and while there was a slight reduction in flexion, she had no neurological deficits.  Sims notes that she has dextroscoliosis but does not identify how that meets Listing 1.05, or any other listing.  The only provision in the listings specifically for scoliosis pertains to children under the age of 18.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, Part B, Listing 101.05.  Without a statement from Dr. Midla or any other physician that the results of the x-rays are consistent with meeting the listings, the ALJ's interpretation of the radiologist's findings and the opinions of doctors who examined her neurological patterns provided substantial evidence for the ALJ's decision.

As a result of her argument that the ALJ's decision was not supported by substantial evidence, Sims requests that the RFC for "light work" that the ALJ arrived at be reversed.  Because the ALJ's anxiety and arthritis conclusions were proper, and because our published opinion holds that there is substantial evidence

to support the ALJ's rejection of her allegation that she has a somatoform disorder, the ALJ's RFC for light work need not be disturbed. Sims has waived other challenges to the RFC for light work by failing to raise them until her reply brief. *See Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005).

Accordingly, we AFFIRM the district court's decision upholding the decision of the ALJ.