Ignacy GREEN, Patrick Cooper, and all those similarly situated, Plaintiffs,

v.

The UPS HEALTH AND WELFARE PACKAGE FOR RETIRED EMPLOYEES, United Parcel Service of America, Inc., and Plan Administrator, Defendants.

Case No. 09 C 616.

United States District Court, N.D. Illinois, Eastern Division.

April 9, 2009.

924

Jeffrey Bensley Gilbert, Johnson, Jones, Snelling & Gilbert, Stephen Jay Rosenblat, Baum, Sigman, Auerbach, Pierson, Neuman & Katsaros, Ltd., Patrick N. Ryan, Baum Sigman Auerbach & Neuman, Ltd., Chicago, IL, for Plaintiffs.

Gary R. Clark, John Allen Klages, Andrew Fisher Hettinga, Quarles & Brady LLP, Chicago, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge:

Ignacy Green and Patrick Cooper filed this suit on behalf of a putative class against the UPS Health and Welfare Package for Retired Employees (Plan) and United Parcel Service of America, Inc. (UPS), alleging a violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1104(a)(1)(D). Plaintiffs contend that defendants raised the amount of contributions required of retirees for health insurance in violation of the terms of the Plan. Plaintiffs moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). During the preliminary injunction hearing, the Court, with the parties' consent, consolidated the hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). In addition, the parties agreed to a certification of a class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(b)(2).

This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Background

UPS employs members of the International Brotherhood of Teamsters (IBT) and negotiates collective bargaining agreements (CBA) with the international union (IBT International) and separately with a few IBT locals. IBT Local 705 is one of the local unions that negotiates a separate CBA with UPS.

In 2002, UPS and Local 705 negotiated and agreed on a CBA that would expire in July 2008. As part of that agreement, UPS agreed to provide health insurance to retired employees in the form of the Health and Welfare Package (HWP). The CBA stated that "Health and Welfare insurance will be provided for full-time employees and retired employees during the term of this Agreement as outlined in the new UPS Health & Welfare Package Summary Plan Description." Def. Ex. 2 at 34.

With respect to retired employees' contributions to the HWP, the Summary Plan Description (SPD) stated that "[a]ll retired employees are responsible for a $50 per month contribution for their medical coverage. This contribution covers the retired employee, spouse and any eligible dependent children." Def. Ex. 4 at 646. The SPD further stated, however, that an additional contribution may be imposed based on the average annual cost per participant:

> The average annual cost per participant is defined as the total claims paid by the Plan in a calendar year, divided by the total number of Plan participants during that year. Each retired employee, each spouse, and each eligible dependent would be considered a Plan participant.

> If the average annual cost per participant exceeds $6,250, each retired employee will share equally in the cost above the $6,250 maximum by making an additional contribution.

> The $6,250 maximum cost per participant is subject to future negotiations. If required, the additional contributions

would not be implemented until after the expiration of the current collective bargaining agreement.

*Id.*

Beginning in 2006, the average annual cost per Plan participant exceeded the $6,250 cap. Alan Rapp, UPS's Corporate Healthcare Manager, testified that the average annual cost per participant has been at least $7,000 since 2006.

In October 2007, UPS sent a Summary of Material Modifications (SMM) to all IBT International and Local 705 retirees in which it stated that the average annual cost per participant of the HWP exceeded $6,250 and that "each retiree will share equally in the cost above the $6,250 maximum by making an additional contribution. Therefore, effective January 1, 2008, the per retiree contribution of $50 per month will increase to $114.33 per month." Def. Ex. 6 at 3. Juan Campos, Local 705's recording secretary, protested to Dan Hoyer, UPS's North Central Regional Labor Relations Manager, that this notice was premature because negotiations for a new CBA were not expected to begin until the summer of 2008. In December 2007, UPS sent a revised SMM to Local 705 retirees in which UPS stated that

> [t]he average cost per participant for the UPS Health and Welfare Package for Retired Employees has exceeded $6,250. As explained in the SPD, when the cost per participant exceeds $6,250, each retired employee will share equally in the cost above the $6,250 maximum by making an additional contribution.
>
> That additional cost will be effective after the expiration of the current collective bargaining agreement.

Def. Ex. 7 at 3. UPS did not receive complaints about the updated SMM from either Local 705 representatives or members.

When UPS issued the October SMM to IBT International and Local 705 retirees, it was engaged in the process of negotiating a new CBA with the IBT International. After UPS and the IBT International reached a tentative agreement but before ratification, union members asserted complaints over the increase in HWP retiree contributions before a national grievance panel. For reasons that are not material to the present dispute, UPS agreed not to collect additional contributions from IBT International retirees until after the expiration of the newly-bargained CBA. This understanding was not reduced to writing and was not incorporated into the CBA between UPS and IBT International.

Negotiations for a new CBA between UPS and Local 705 began in June 2008, with the existing CBA set to expire on July 31, 2008. During the negotiations, Campos asked whether the previous SPD for the HWP was current with respect to the new CBA. Chris Langan, the Finance Liaison to the Labor Group at UPS, told Campos that it was. During the negotiations, Local 705 did not propose raising the $6,250 cap or deferring the collection of additional contributions from retirees. Similarly, UPS did not raise the issue of additional contributions from retirees.

UPS and Local 705 reached agreement on a new CBA in July 2008. The new CBA became effective August 1, 2008 for a five year period, through July 31, 2013. The new CBA did not directly address the issue of retiree contributions. It incorporated the SPD, which continued to state that additional contributions would not be collected until the expiration of the "current" CBA. That same language appears in the SPD even now.

In January 2009, Local 705 retirees received a notice from UPS stating that the average annual cost per participant had risen above the $6,250 cap. The notice

also stated that after February 1, 2009, each Local 705 retiree would be required to contribute $157.58 per month for individual coverage, $315.17 per month for individual and spousal coverage, and $472.75 for individual, spousal, and dependent children coverage. This was a significant increase over the previous retiree contribution of $50.00 for all types of coverage.

At trial, three retired members of Local 705 testified concerning the harm they would suffer if a preliminary injunction was not issued (this was before the Court and the parties agreed to combine the preliminary injunction hearing with trial on the merits). Patrick Cooper, Roger Smith, and Peter Lagioia all testified that the HWP was very important to them and that they valued the high quality healthcare they received for a relatively low cost. Each testified in detail about his financial situation.

## Discussion

ERISA authorizes plan participants to sue fiduciaries for violations of the plan. 29 U.S.C. § 1132(a)(3)(B). A court may enjoin practices that violate the plan and may order other equitable relief to redress past violations. *Id.*

### 1. Consolidation of preliminary injunction hearing with trial on the merits

Federal Rule of Civil Procedure 65(a)(2) allows a court to consolidate the preliminary injunction hearing with the trial on the merits "before or after beginning the hearing on a motion for a preliminary injunction." Fed.R.Civ.P. 65(a)(2). Although the decision to consolidate is left to the court's discretion, "the district court must provide 'clear and unambiguous notice ... before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases.'" *Am. Train Dispatchers Dept. of Int'l Bhd. of Locomotive Eng'rs v. Fort Smith R.R. Co.*, 121 F.3d 267, 270 (7th Cir.1997) (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir.1972)). Shortly after the start of the preliminary injunction hearing, the Court proposed consolidating the preliminary injunction hearing with the trial on the merits and asked the parties if they intended to present any evidence at trial that they were not planning to present at the hearing. Both sides considered the question and thereafter reported that they did not plan to present additional evidence at trial. Neither side objected to the consolidation or said that it had insufficient time to consider the matter or to develop in full its evidence on the merits.

### 2. Class certification

Plaintiffs orally moved at trial to certify a class pursuant to Rule 23(b)(2). The parties submitted a proposed order of certification. They agree that plaintiffs and the proposed class meet the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation. Fed.R.Civ.P. 23(a). In addition, the parties agree that the defendants have "acted ... on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2).

The Court agrees that certification of a class of approximately 460 Local 705 retirees is appropriate and warranted under the circumstances. The Court therefore certifies a class consisting of all past, current and future participants in the UPS Health and Welfare Package for Retired Employees who receive coverage under the Plan due to their, or a family member's, former employment with UPS as a member of Teamsters Local 705.

### 3. Applicable legal standard

The first question on the merits concerns the standard by which the Court

determines whether plaintiffs have proven that defendants violated the terms of the Plan. Courts generally review a denial of benefits under ERISA de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When, however, the plan expressly gives the fiduciaries discretion to make benefit determinations or to interpret plan terms, the fiduciaries' determination stands unless it is an abuse of their discretion. *Id.; Hess v. Reg–Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir.2005). In such a case, the fiduciaries' determination will be upheld unless it is "downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir.1999). Other determinations may be subject to de novo review, irrespective of whether the plan confers discretion. *See Armstrong v. LaSalle Nat'l Assoc.*, 446 F.3d 728, 733 (7th Cir.2006) (assuming, but not holding, that judicial review of a fiduciary's investment decision for prudence is plenary).

▪ This is not a denial of benefits case, nor does it involve a claim of imprudent investing. The gravamen of plaintiffs' claim is that defendants erroneously interpreted the SPD to allow the Plan to collect additional contributions from Local 705 retirees prior to the expiration of the "current" CBA between Local 705 and UPS. Plaintiffs contend that the Court should review the plan administrators' interpretation of the plan de novo. They draw an analogy to *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325 (3d Cir.1984). In that case, the court concluded that the standard depends upon the nature of the alleged breach of fiduciary duty. *Id.* at 333. If the alleged breach involves a balancing of competing interests between plan participants, the deferential standard should apply. *Id.* If the issue is whether the fiduciary has "sacrificed valid interests to advance the interests of non-

beneficiaries," however, review is de novo. *Id.* at 334. Plaintiffs contend that the issue in this case is whether defendants sacrificed the interests of Local 705 retirees to save UPS the cost of covering the increased cost of coverage under the HWP. Defendants contend that the deferential standard applies, even though this is not a denial of benefits case.

▪ ERISA draws from principles of trust law, and courts have borrowed from trust law to fill in the gaps of the statute. *Firestone*, 489 U.S. at 110–11, 109 S.Ct. 948. In fact, the Supreme Court has stated that "[i]n 'determining the appropriate standard of review,' a court should be 'guided by principles of trust law.'" *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008) (quoting *Firestone*, 489 U.S. at 111–13, 109 S.Ct. 948). The deferential standard of review used in some ERISA cases comes from trust law. *Firestone*, 489 U.S. at 111, 109 S.Ct. 948 ("A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed is reasonable.") (citing Restatement (Second) of Trusts § 559 (1959)). Although *Firestone* concerned a challenge to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), other courts, including the Seventh Circuit, have used the standard enunciated in *Firestone* outside the denial of benefits context. *See White v. Sundstrand Corp.*, 256 F.3d 580, 584 (7th Cir.2001) (employing the deferential standard to review a fiduciary's interpretation of the term "annuity purchase rates in effect" to determine amount of pension benefits).

The case at hand involves a dispute over plan interpretation. The parties agree that the Plan vests fiduciaries with "the exclusive right and discretion to interpret the terms and conditions of the Plan." Ex. 5 at 92. As the Supreme Court has stated,

trust law provides that a trustee's reasonable interpretation of ambiguous terms in a trust agreement will not be overturned when the trust agreement grants to the trustee the power to interpret terms. *Firestone*, 489 U.S. at 111, 109 S.Ct. 948 (citing Restatement (Second) of Trusts § 559 (1959)). The proper standard of review, therefore, is the deferential abuse of discretion standard, also referred to as the arbitrary and capricious standard.

That said, "[d]eferential review is not no review." *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (citing *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir.1996)). A fiduciary's interpretation is arbitrary and capricious or an abuse of discretion when it falls outside the range of reasonable interpretations. *See Carr*, 195 F.3d at 294. An interpretation that "controverts the plain meaning of a plan" is arbitrary and capricious. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir.1996). If, by contrast, the fiduciary's interpretation in reasonable, its determination will not be overturned even if the Court might have read the plan differently if left to its own devices. *Reg–Ellen Machine Tool*, 423 F.3d at 658 (citing *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir.2005)).

With this standard in mind, the Court turns to the two provisions of the plan that plaintiffs contend prohibit defendants from collecting additional contributions from Local 705 retirees until after the current CBA expires, that is, until July 31, 2013.

### 4. Meaning of "current"

The SPD, both as it existed as of late 2002 and in its current form, states that "[i]f required, the additional contributions would not be implemented until after the expiration of the current [CBA]." Ex. 5 at 87. Plaintiffs contend that the phrase "current CBA" refers to the CBA now in effect. As a result, plaintiffs contend, defendants were prohibited from raising the contribution rates in 2009: the July 2008 CBA incorporated the SPD, which, in turn, stated that additional contributions would not be collected until the "current" CBA's expiration. Ex. 1 at UPS00097 ("Health and Welfare insurance shall be provided ... as outlined in the new UPS Health and Welfare Package Summary Plan Description"). Defendants, by contrast, contend that the term "current CBA" was intended to refer only to the CBA in effect between 2002 and 2008.

The SPD incorporated into the CBA ratified in 2008 was identical to the one incorporated into the 2002–2008 CBA in all respects relevant to the dispute at hand. Even after approval of the new CBA, defendants made no change to the SPD's retiree contribution sections, despite the fact that the average annual costs for participants, including IBT International and Local 705 retirees, had exceeded the $6,250 cap for about two years. The SPD—meaning the SPD as it existed even after the new CBA was approved—did not communicate to participants that costs had in fact exceeded $6,250, but stated that additional contributions would be required "*[i]f* the average annual cost per participant exceeds $6,250 ..." but would not be implemented until "after the expiration of the current [CBA]." *Id.* (emphasis added).

Defendants argue that the doctrine of extrinsic ambiguity applies and that the Court should consider extrinsic evidence of the intent underlying the agreement to avoid what they contend would be an absurd result. Defendants contend that the evidence—specifically, the circumstances under which the language was first drafted; the testimony of Gerald Nerone, UPS's former North Central Labor Relations Manager, regarding the 2002 negotiations; the course of dealings between the

two parties; and the testimony of Dale Whitney, UPS's former Corporate Healthcare Manager, regarding his own intent in drafting the document—support the Plan's interpretation of the pertinent language.

 "In limited circumstances, [ ] parties are allowed to present extrinsic evidence to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what it seems to mean." *Mathews v. Sears Pension Plan,* 144 F.3d 461, 466 (7th Cir. 1998). This extrinsic evidence must be objective; "that is, it must not depend on the credibility of testimony … of an interested party," including "an agent or employee of the party." *Id.* at 467 (citing cases). This limitation prevents parties from re-writing contracts after the fact through self-serving testimony. *Id.*

Notwithstanding this limitation, defendants urge the Court to consider the testimony of Nerone and Whitney because they were "uncontested," citing *Rossetto v. Pabst Brewing Co.,* 217 F.3d 539, 546 (7th Cir.2000). Defendants present an incomplete picture of *Rossetto.* The language quoted by defendants as allowing the consideration of testimony so long as it is uncontested describes the evidence presented in that case as both disinterested and uncontested. *Id.* The very next sentence of *Rossetto* states, however, that "[e]vidence is not objective when it is the selfserving testimony of one party of the contract as to what the contract, clear on its face, 'really' means, contrary to what it seems to mean." *Id.* (citing cases); *see also AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.,* 44 F.3d 572, 575 (7th Cir.1995) (" 'subjective' evidence is inadmissible" to "demonstrate that apparently clear contract language means something different from what it seems to mean").

Neither Whitney nor Nerone qualifies as disinterested; both were UPS employees. In addition, the *Rossetto* court rejected subjective testimony that was "selfserving" and "unverifiable." *Id.* Because Nerone's and Whitney's testimony concerning their thought processes during drafting and negotiations is both subjective and unverifiable, under *Rossetto* it does not allow the Court to conclude that a latent ambiguity exists.

There is, however, objective evidence that concerns the meaning of the term in question. The first category of such evidence involves the course of dealing between the parties and between defendants and the IBT International and the circumstances surrounding the drafting of the SPD. Defendants contend that the fact that the 2002–2008 CBA was in effect at the time the SPD was first issued indicates that the SPD referred to the 2002–2008 CBA and no other. This fact, however, does not transform the term "current CBA" into "the CBA expiring in 2008." "Current" refers to a state of affairs at a particular point in time. *Merriam Webster's Collegiate Dictionary,* 284 (10th ed. 1999)("(1): presently elapsing (2): occurring in or existing at the present time"). The SPD is not a static document that describes the state of affairs at a particular moment in time. Rather, it was issued to participants on a continuous basis beginning in 2002 and through the present date, without changing the term that told participants that the contribution amounts would not be increased until after the "current" CBA expired. From 2002 through July 31, 2008, the term "current" referred to the CBA that was in effect during that period. But when the Plan continued to issue the same SPD even after August 1, 2008, the term "current," at least on its face, referred to the newly adopted CBA.

Defendants contend, however, that the December 2007 SMM shows that the term "current CBA" in the SPD as it now exists refers only to the 2002–2008 CBA. That SMM informed Local 705 retirees and representatives that the cap had been exceeded and that defendants intended to collect additional contributions when the "current" CBA expired. Ex. 7 at 3 ("That additional cost *will* be effective after the expiration of the current CBA.") (emphasis added). The CBA in effect in December 2007 was the 2002–2008 CBA. Defendants contend that this SMM effectively amended the SPD.

ERISA requires that an SPD, including specific information about the plan, be issued to participants. 29 U.S.C. § 1022(a). "The SPD must be 'sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" *Klosterman v. Western General Mgmt., Inc.,* 32 F.3d 1119, 1122 (7th Cir. 1994) (quoting 29 U.S.C. § 1022(b)). ERISA also requires fiduciaries to provide beneficiaries with a summary of any material modification of the plan "in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). Material modifications include modifications to "requirements respecting eligibility for participation and benefits." *Id.* at § 1022(b); *see also* 29 C.F.R. § 2520.102–3(j)(3) (requiring that SPDs "include a description of: any cost-sharing provisions, including premiums, deductibles, coinsurance, and copayment amounts for which the participant or beneficiary will be responsible"). Because the December 2007 stated clearly that there would be future changes in the contributions due from re-

tirees, it appears to be a proper SMM that amended the SPD.

Plaintiffs contend that the December 2007 SMM was ineffective as an amendment to the SPD because it failed to specify the amounts that would be collected from the retirees. Plaintiffs, however, neglect the fact that Local 705 insisted that UPS rescind the October 2007 SMM, which plaintiffs concede contained the requisite specificity. Local 705 raised no objections to the December 2007 SMM, issued only to the Local 705 retirees in response to that Local's complaint about the October 2007 SMM. Plaintiffs concede that the January 2009 letter specified amounts in accordance with the regulations but argue that it was ineffective to raise contribution rates because the CBA then in effect would not expire until July 31, 2013.

Plaintiffs' argument, if accepted, would create a Catch–22 for defendants. According to plaintiffs' reasoning, defendants could not issue an SMM detailing the amounts *before* the expiration of the 2002–2008 CBA because the old CBA was still in effect, yet they could not change the amounts *after* the expiration of the 2002–2008 CBA because a new CBA was in effect. In other words, the upshot of plaintiffs' position is that defendants would be stymied from amending the Plan on this particular topic via an SMM. The Plan, however, clearly provides that defendants were empowered to amend the Plan unilaterally.[1] Ex. 5 at 95 ("UPS reserves the right to amend or terminate [the] Plan at any time."). Via the December 2007 SMM, defendants did just that.

---

1. Defendants contend that they cannot be bound by the SPD because they are empowered to amend the Plan at any time. This is incorrect. Although defendants have the sole power to amend the Plan, they must do so in accordance with ERISA, which requires written notification of amendments to plan participants. 29 U.S.C. § 1022(a). Until proper notifications are sent to participants, defendants remain bound by the Plan as it is.

The December 2007 SMM unequivocally stated that the costs per participant had exceeded the cap and that additional contributions "will be effective after the expiration of the current [CBA]." Ex. 7 at 3. This is a clear change from the language of the SPD, which refers to the costs exceeding the cap as a possibility that, if it came to pass, would trigger increased contributions. Thus irrespective of the language of the SPD, the December 2007 SMM, which modified the Plan, made it reasonably clear that contributions would be increased after the "current" CBA—at that point, the 2002–2008 CBA—expired. Under the circumstances, defendants' determination that the term "current" in the SPD referred only to the 2002–2008 CBA was within the range of reasonable interpretations. Accordingly, the Court declines to overturn that interpretation.

### 5. Meaning of "share equally"

 Plaintiffs contend that defendants may not, consistent with the SPD, collect additional contributions from Local 705 retirees, because they are not collecting additional contributions from other IBT retirees. The SPD, which covers not just Local 705 retirees, but all UPS retirees who are members of the IBT covered by the HWP,[2] states that "[i]f the cost per participant exceeds $6,250, each retired employee will share equally in the cost above $6,250 by making an additional contribution." Ex. 5 at 87. Defendants contend that the term "share equally" refers to how the additional contributions are calculated, not how they are collected.

As indicated earlier, defendants are not collecting additional contributions from the IBT International retirees until at least 2013. Plaintiffs contend defendants are violating this provision by collecting addi-

tional contributions from Local 705 retirees but not from other IBT retirees.

Alan Rapp's testimony, quoted by defendants in their post-trial brief, is representative of defendants' argument:

Shared equally is the calculation process that we go through to determine what the average cost per participant is in a calendar year. As I said, the shared equally is the process we use to avoid the possibility of an individual experiencing some extremely high claim costs or pharmacy costs in a given year.

Tr. 160. In short, Rapp contended that the phrase "shared equally" concerns how the Plan calculates average costs, not how it collects additional contributions.

Defendants' construction effectively writes out of existence the last clause of the provision in question. The SPD states that the retirees "will share equally in the cost above the $6,250 maximum *by making an additional contribution.*" Ex. 5 at 87 (emphasis added). The term "share equally," when read in context—the only reasonable way to read it—unambiguously concerns how retirees will contribute, not how the Plan will calculate average costs.

The paragraph immediately before the one in question further undermines defendants' proposed interpretation. That paragraph states that "[t]he average annual cost per participant is defined as the total claims paid by the Plan in a calendar year, divided by the total number of plan participants during that year." *Id.* This term is the one that defines how the Plan calculates cost per participant. If defendants' interpretation of the term "share equally" were correct, it would essentially duplicate language in the prior paragraph of the SPD.

---

**2.** The evidence presented at trial showed that a small number of IBT Locals belonged to a

different health insurance plan and were not covered by the SPD at issue in this case.

Defendants also contend that their interpretation is supported by the SPD because it states that the contributions are subject to negotiation.[3] This argument, however, is also at odds with the plain meaning of the Plan. The SPD states that the "$6,250 maximum cost per participant is subject to negotiation." It does not state that the "share equally" requirement is subject to negotiation.

In sum, the SPD's statement that each retired employee will "share equally ... by making an additional contribution" describes how the retirees will contribute, not how the defendants calculate the cost per participant. Defendants' interpretation of "shared equally" contradicts the plain language of the Plan and is therefore arbitrary and capricious.

### Conclusion

The Court grants plaintiffs' oral motion for class certification. For the reasons stated above, the Court finds in favor of plaintiffs and against defendants. Defendants are enjoined from collecting additional HWP contributions from Local 705 retirees. Plaintiffs' counsel are directed to prepare a proposed judgment order, which defendants' counsel are to review for form. A proposed order is to be presented by the Court by no later than April 16, 2009.

---

**3.** Defendants do not argue that the December 2007 SMM has any bearing on the interpretation of the "share equally" language. Indeed, the December 2007 restates the exact language in question.